NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

_____

YAMAHA MOTOR CORPORATION, U.S.A., *Plaintiff/Appellant,*

*v.*

ARIZONA DEPARTMENT OF TRANSPORTATION, an agency of the
State of Arizona; EXECUTIVE HEARING OFFICE, ARIZONA
DEPARTMENT OF TRANSPORTATION MOTOR VEHICLE DIVISION,
an agency of the State of Arizona; and YSA MOTORSPORTS, LLC, an
Arizona Limited Liability Company, *Defendants/Appellees.*

No. 1 CA-CV 13-0242

FILED 07-03-2014

_____

Appeal from the Superior Court in Maricopa County
No. LC2011-000504-001
The Honorable Crane McClennen, Judge

**AFFIRMED**

_____

COUNSEL

Snell & Wilmer L.L.P., Phoenix
By Michael T. Liburdi, Mark A. Molique

Baker & Hostetler L.L.P.
By Maurice Sanchez, Kevin M. Colton
*Co-Counsel for Plaintiff/Appellant*

Arizona Attorney General's Office, Phoenix
By Stephanie A. Lillie
*Counsel for Defendants/Appellees ADOT, et al.*

Jennings Haug & Cunningham L.L.P.
By Chad L. Schexnayder, Hillary P. Gagnon
*Counsel for Defendant/Appellee YSA Motorsports, L.L.C.*

---

**MEMORANDUM DECISION**

Judge Margaret H. Downie delivered the decision of the Court, in which Presiding Judge Kenton D. Jones and Judge Donn Kessler joined.

---

**D O W N I E**, Judge:

**¶1** Yamaha Motor Corporation, U.S.A. ("Yamaha") appeals the superior court's judgment affirming the denial of its request to establish a new dealership. For the following reasons, we affirm.

## BACKGROUND

**¶2** As required by statute, the Arizona Department of Transportation ("ADOT") notified two Yamaha franchisees — YSA Motorsports, LLC ("YSA") and Apache Motorcycles Inc. ("Apache") — of Yamaha's recently filed notice of intent to establish a new dealership in North Scottsdale. *See* Ariz. Rev. Stat. ("A.R.S.") § 28-4453(A)-(B). Go AZ Motorcycles ("Go AZ") would operate the proposed new franchise, which would sell Yamaha products exclusively. YSA objected to Yamaha's proposal and requested a hearing through the Executive Hearing Office ("EHO"). *See* A.R.S. § 28-4454.

**¶3** A multi-day hearing was held before an Administrative Law Judge ("ALJ"). Both Yamaha and YSA presented numerous witnesses and exhibits. The ALJ thereafter issued detailed findings of fact and conclusions of law, ultimately concluding Yamaha had not established good cause for the proposed new dealership. Yamaha sought review in the superior court. *See* A.R.S. §§ 12-905(A), 28-4456(G). The superior court affirmed, and Yamaha timely appealed. We have jurisdiction pursuant to A.R.S. § 12-913.

**DISCUSSION**

### I.  Standard of Review

¶4  In reviewing an administrative agency's decision, the court "shall affirm the agency action unless after reviewing the administrative record . . . the court concludes that the action is not supported by substantial evidence, is contrary to law, is arbitrary and capricious or is an abuse of discretion."  A.R.S. § 12-910(E).  We do not reweigh the evidence to determine whether we would find it more or less persuasive or significant than the ALJ.  *See Shaffer v. Ariz. State Liquor Bd.,* 197 Ariz. 405, 409, ¶ 18, 4 P.3d 460, 464 (App. 2000).  We instead review the record to determine whether there has been "unreasoning action, without consideration and in disregard for facts and circumstances; where there is room for two opinions, the action is not arbitrary or capricious if exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached."  *Petras v. Ariz. State Liquor Bd.,* 129 Ariz. 449, 452, 631 P.2d 1107, 1110 (App. 1981); *see also E. Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n,* 206 Ariz. 399, 409, ¶ 35, 79 P.3d 86, 96 (App. 2003) (substantial evidence exists to support agency decision if either of two inconsistent factual conclusions is supported by the record).  However, we review *de novo* statutory interpretations by and legal conclusions of the ALJ and superior court.  *See Anderson v. Ariz. Game & Fish Dep't,* 226 Ariz. 39, 40, 243 P.3d 1021, 1022 (App. 2010); *Eaton v. Ariz. Health Care Cost Containment Sys.,* 206 Ariz. 430, 432, ¶ 7, 79 P.3d 1044, 1046 (App. 2003).

### II.  Statutory Framework

¶5  A franchisor such as Yamaha may not establish "an additional new motor vehicle dealership in a community in which the same line-make is then represented, unless there is good cause for the additional new motor vehicle dealership under the franchise and unless it is in the public interest."  A.R.S. § 28-4452(B).  To establish such a dealership, the franchisor must file a "notice of intention to enter into a franchise for additional representation of the same line-make."  A.R.S. § 28-4453(A).  ADOT then sends notice "to all franchisees of the same line-make in the community and to all other franchises located within ten miles of the proposed dealership . . . if located outside the community, who are then engaged in the business of offering to sell or selling the same line-make."  A.R.S. § 28-4453(B).  If a franchisee that has standing to object

does so, ADOT refers the matter to EHO for a hearing.[1]  *See* A.R.S. §§ 28-4454 to -4455.

¶6          The ALJ is required to consider the "existing circumstances," including the following specific factors:

> 1. Amount of business transacted by other franchisees of the same line-make in that community.
>
> 2. Investment necessarily made and obligations incurred by other franchisees of the same line-make in that community in the performance of their part of their franchises.
>
> 3. Whether the franchisees of the same line-make in that community are providing adequate consumer care for the new motor vehicle products of the line-make, including the adequacy of new motor vehicle dealer sales and service facilities, equipment, supply of parts and qualified management, sales and service personnel.
>
> 4. The economic impact on existing franchisees of the same line-make due to the addition of a franchise.
>
> 5. The effect on the retail motor vehicle business and the consuming public.

A.R.S. § 28-4457(E).

¶7          Yamaha conceded in its written closing argument filed with the ALJ that it bore the burden of proof, stating:  "The applicable standard of proof is whether Yamaha has established, by a preponderance of the evidence, that good cause exists to appoint the new dealer franchise."

### III.          The Administrative Hearing

¶8          Both Yamaha and YSA presented extensive evidence regarding the A.R.S. § 28-4457(E) factors.   The ALJ articulated and discussed each factor and also addressed other "existing circumstances" she deemed relevant.   Yamaha's primary challenge on appeal is to the ALJ's interpretation and analysis of the (E)(4) factor:  the economic impact

---

[1] Yamaha has not challenged YSA's standing.

the proposed dealership would have on existing franchisees of the same line-make.

¶9          The record does not support Yamaha's claim that the ALJ required it to prove "there is *no possibility of any adverse effects on other dealers* as a result of the appointment of the new dealership."  (Original emphasis.)  The ALJ instead observed that the (E)(4) factor "is the most difficult one to evaluate because it is based on speculation.  Neither party can definitively say that the addition of a new dealer point will increase or decrease the sales of the existing dealers."  It was in this context that the ALJ agreed with Yamaha "that neither YSA nor Apache proved that they *would be* negatively impacted by the appointment of a new dealer." (Emphasis added.)

¶10          Although the ALJ concluded that neither side definitively established the economic impact a new dealership would have on existing franchisees, she was able to say, based on the evidence presented, that it was "*more likely* that an added competitor will reduce sales at the existing dealers and negatively impact them, than have a positive impact." (Emphasis added.)  *See, e.g.*, *State v. Rojers*, 216 Ariz. 555, 559, ¶ 19, 169 P.3d 651, 655 (App. 2007) ("preponderance of the evidence" means "more likely than not").  Evidence of record supports this conclusion.

¶11          The proposed dealership would be roughly 8.6 miles from YSA's existing location.  YSA's witnesses testified about adverse economic effects YSA and other Yamaha dealers would suffer if the new dealership opened.  W. Michael Richards, general manager of Apache Motorcycles Group, testified that if the new franchise were awarded, Apache would "ultimately close down, sooner rather than later."[2]  He opined that the closure of Apache's store, which has operated in the same location for roughly 15 years, would also have a "terrible effect" on customers, requiring them to "travel two or three times the distance, or maybe ten times the distance if they need servicing."  Richards testified that the proposed dealership would take customers away from existing dealers. He further stated that Richard McKim, Yamaha's district manager for Arizona and Nevada, acknowledged there were "too many dealerships in this town for the number of customers that were available in the economy" when discussing weak sales at a now-closed Yamaha-exclusive dealership in North Phoenix.  Richards testified there was insufficient

---

[2] Apache Motorcycle Group owns three motorsports stores in the Phoenix trade market, including Apache.

business for existing dealers, "much less adding new dealerships and franchises in." On cross-examination, he rejected Yamaha's suggestion that Apache could make up for lost Yamaha sales by selling other products, stating:

> Counselor, if there is extra business to have out there, I'm already chasing it. There isn't extra business to have. The problem is there isn't enough customers as there is. And now is not the time to be opening new stores, in my opinion, because we're just chasing after smaller and smaller group of customers.
>
> Until our economy settles down here in Maricopa County and people get their jobs back and we see the industry either flatten or start to rebound, that will be the time to open up more opportunities to people. But we haven't seen that.
>
> Those of us that have stayed in this community for 20, 25 years and worked 50, 60 hours a week to build our business are doing everything, believe me, everything we can to keep our customers and make sure that they're happy. We've invested our entire lives her[e]. This is not the time to be bringing in more dealerships; that is my opinion.

Consistent with Richards' testimony, the ALJ found that "[a] reduction in sales of Yamaha products at YSA Motorsports and Apache Scottsdale could not be recouped through the sales of its other manufacturing brands."

¶12        William Nash, chief operating officer of RideNow, William Coulter, YSA's owner, and William Marx, RideNow's business development director, also testified that the proposed new franchise would negatively affect existing Yamaha dealers.[3] Nash opined it "would redistribute the current sales." Coulter explained that he moved another RideNow-affiliated Yamaha dealership located within a half-mile of the proposed new franchise (Desert Motorsports) because it was competing with YSA for sales and service customers. Yamaha reportedly permitted the relocation because it did not believe the "area was underserved."

---

[3] RideNow is a national conglomerate to which YSA belongs and is one of two organizations with which all Yamaha dealers in the Phoenix trade market are affiliated (the other being Apache Motorcycle Group).

Nash testified that after Desert Motorsports moved, YSA's customers and market share increased. Marx discussed the competition for customers between Desert Motorsports and YSA and the decrease of sales due to their proximity. He ended his direct testimony by stating:

> [T]here's no need for an additional dealership in this area. I know that it will negatively impact our Phoenix store. I know that from experience. The geography is virtually unchanged from what it was before, just going in the opposite direction. I know it will negatively impact sales at that store.
>
> I also know, based on Go AZ's business model that it's going to negatively impact every one of our stores in the region. They're very big on the Internet. They're very big on selling at or below invoice and it's going to hurt all of the stores; not just the RideNow stores, it's going to really affect the Apache stores as well.

¶13 Coulter offered similar testimony, making clear that his opinions were based on his substantial experience with the Phoenix motorsports market:

> Q. . . . . You're aware of what is going on economically in the motorsports industry right now, correct?
>
> A. Absolutely.
>
> Q. Last few years, how would you characterize the market generally?
>
> A. Most difficult that I've seen in my career.
>
> . . . .
>
> Q. If your sales at YSA decreased further or if you are forced to lower prices on product even more by increased competition, do you believe that could threaten the survival of YSA as a business entity?
>
> . . . .
>
> A. Absolutely.

Coulter also testified that Yamaha products are adequately represented in the North Phoenix/Scottsdale area.

**¶14**        We recognize that Yamaha offered contrary evidence, including testimony by and a report from Donald Vivrette. But as discussed *supra*, ¶ 4, it was the ALJ's role to weigh the evidence and to determine what was the most credible and persuasive. *See Siler v. Ariz. Dep't of Real Estate*, 193 Ariz. 374, 382, ¶ 41, 972 P.2d 1010, 1018 (App. 1998). Where, as here, "there is room for two opinions," *Petras*, 129 Ariz. at 452, 631 P.2d at 1110, we will not set aside the ALJ's ruling.

**¶15**        We also disagree with Yamaha's characterization of YSA's evidence as "unfounded self-serving testimony, speculation, and conjecture as to the effect that the proposed franchise might have on the existing market."[4] YSA's witnesses were competent to testify based on their substantial experience with the Phoenix motorsports market. They were able to offer market-specific explanations for trends that Yamaha's expert identified. They opined, for example, that a post-2006 downturn in sales of Yamaha products was the result of the bad economy, Yamaha's failure to timely respond to competitors' aggressive pricing and rebate programs, and Yamaha's inability to provide franchisees a sufficient supply of a popular vehicle. They also testified about actual market effects caused by the closure of the Apache dealership and by Desert Motorsports' move to the West Valley. Yamaha had the opportunity to

---

[4] Yamaha elicited lay testimony as well, some of which was even more conclusory than YSA's evidence. McKim, for example, testified:

> Q. Mr. McKim, do you have an opinion as to how opening Go AZ in Scottsdale would impact RideNow Phoenix and the other Phoenix dealers?
>
> A. How it will impact them?
>
> Q. If it will impact them, how it would impact them?
>
> A. I think there's -- I think there's opportunity there. I think that through -- I think that's what we've shown. That the missing units, there's more to go around. There's clearly -- there's people still -- people want to be a part of Phoenix, prospects and so forth. So it's -- yeah, there's room.

cross-examine YSA's witnesses and to highlight perceived deficiencies in their testimony.

¶16        Yamaha stresses that YSA failed to quantify the claimed adverse economic effects.  The statute, though, does not mandate such specificity, and Yamaha conceded that it bore the burden of establishing good cause for the new franchise.  At most, the lack of quantification would affect the weight to be given YSA's evidence.  And to the extent Yamaha suggests expert evidence is always superior to lay testimony, we disagree.  Indeed, jurors in civil trials are routinely instructed that:

> Expert opinion testimony should be judged just as any other testimony. You are not bound by it. You may accept or reject it, in whole or in part, and you should give it as much credibility and weight as you think it deserves, considering the witness's qualifications and experience, the reasons given for the opinions, and all the other evidence in the case.

Revised Arizona Jury Instructions (Civil) Preliminary 6.  The ALJ gave credence to some, but not all, of Yamaha's expert's evidence.  For example, she found Vivrette's market share calculations for the Phoenix market to be accurate, but did "not find all of the conclusions Yamaha draws from those numbers to be accurate."

¶17        Nor does the record support Yamaha's assertion that the ALJ placed undue weight on the economic impact factor.  The ALJ analyzed each statutory factor individually, offering roughly equal coverage to each.  Moreover, nothing required her to give equal weight to each factor. *Cf. US W. Commc'ns, Inc. v. Ariz. Corp. Comm'n*, 201 Ariz. 242, 246, ¶ 17, 34 P.3d 351, 355 (2001) (although corporation commission must consider fair value of public service company's property when setting rates, the weight to be afforded the fair value factor, relative to other information, is within commission's broad discretion); *Morris v. Ariz. Corp. Comm'n*, 24 Ariz. App. 454, 457, 539 P.2d 928, 931 (1975) (The rate-making process "does not lend itself to rule formulation because the relevant factors may be given different weight in the discretion of the Commission at the time of the inquiry.").

¶18        Yamaha places great emphasis on the ALJ's statement that, "General business sense . . . suggests that less competition is better." Read in context, we do not read these nine words, culled from an 18-page decision, as an erroneously broad proclamation that less competition is always "better."  We instead understand the ALJ to be saying that, based

on the statutory factors and existing circumstances *in this case*, added competition in the form of the proposed new dealership would benefit neither existing franchisees nor the public interest. *See* A.R.S. § 28-4452(B).

**¶19** Furthermore, the economic impact on existing franchisees was one of several factors the ALJ weighed. She also discussed A.R.S. § 28-4457(E)(1) (amount of business transacted by other franchisees of the same line-make in the community). Although the ALJ concluded Yamaha is "not meeting its national averages for sales in the Phoenix trade area," she found both parties' explanations for the under-performance "overly simplified" and "lack[ing] some credibility." Yamaha, she concluded, blamed existing franchisees for "[a]ny low number," ignoring competitors' actions and a Phoenix economy that is "struggling more" than others. But the ALJ also rejected YSA's contention the economy and Yamaha are "completely to blame for Yamaha's comparatively low market share." She concluded that Yamaha's failure to offer incentive programs comparable to its competitors affected sales in the Phoenix market, as did its failure to allocate sufficient "popular vehicles" to the market.

**¶20** The ALJ also considered the sizeable capital and manpower investments YSA and Apache have made in promoting, selling, and servicing the Yamaha brand. *See* A.R.S. § 28-4457(E)(2). Yamaha does not challenge the ALJ's findings or conclusions regarding this factor, including her determination YSA and Apache "rely heavily on sales of Yamaha products" and "spend time advertising the brand . . . and training their employees on how to use its products." The ALJ clearly found that this statutory factor favors existing franchisees, not Yamaha.

**¶21** The ALJ additionally analyzed the adequacy of current franchisees' "consumer care," A.R.S. § 28-4457(E)(3), concluding "the existing dealers are providing adequate facilities and customer service in the Phoenix area." She found Yamaha's evidence about YSA's purported failure to comply with obligations under the franchise agreement to be incredible. Yamaha recites some of the contradictory evidence it presented at hearing regarding consumer care but does not raise a specific challenge to the ALJ's analysis of this factor.

**¶22** Finally, the ALJ addressed the likely effect the proposed dealership would have on "the retail motor vehicle business and the consuming public." A.R.S. § 28-4457(E)(5). After noting and discussing the conflicting evidence on this point, the ALJ concluded that, "increasing the competition amongst the dealers is more likely to result in a loss of

sales for the existing dealers than an increase at this time." Such an effect, she ruled, "would have a negative effect on the retail motor business, and would not be in the public interest." Although the evidence on this point was conflicting, there is substantial evidence in the record that supports the ALJ's conclusion.

## CONCLUSION

**¶23** The ALJ correctly interpreted and applied the statutory factors and other existing circumstances. Substantial evidence supports her conclusion that Yamaha failed to establish good cause for the proposed new dealership. We therefore affirm the judgment of the superior court. We deny Yamaha's request for an award of attorneys' fees against ADOT under A.R.S. § 12-348. Yamaha is not the prevailing party, and ADOT is a nominal party in these proceedings. *See* A.R.S. § 12-348(H)(4); *MVC Constr. v. Treadway*, 182 Ariz. 615, 618, 898 P.2d 993, 996 (App. 1995). We deny YSA's fee request based on ARCAP 25 because Yamaha's appeal was not frivolous. Upon compliance with ARCAP 21, though, YSA is entitled to recover its appellate costs.



Ruth A. Willingham · Clerk of the Court
F I L E D : gsh